File No. 15454-13/RWH
**PARKER McCAY P.A.**
**By:  Richard W. Hunt, Esquire**
**9000 Midlantic Drive, Suite 300**
**P.O. Box 5054**
**Mount Laurel, New Jersey  08054**
**(856) 596-8900**
**Email:  rhunt@parkermccay.com**
Attorneys for Plaintiffs, Holtec International, Holtec Decommissioning International, LLC and Oyster Creek Environmental Protect, LLC

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON VICINAGE

| | |
|---|---|
| HOLTEC INTERNATIONAL, HOLTEC DECOMMISSIONING INTERNATIONAL and OYSTER CREEK ENVIRONMENTAL PROTECT, LLC<br><br>　　　Plaintiffs,<br><br>　　　　　v.<br><br>TOWNSHIP OF LACEY, a body politic of the State of New Jersey, and THE TOWNSHIP OF LACEY PLANNING BOARD,<br><br>　　　Defendants. | HONORABLE<br><br>CIVIL ACTION NO.:<br><br>　　CIVIL ACTION<br><br><br>**VERIFIED COMPLAINT** |

## NATURE OF ACTION

1.　　Oyster Creek Nuclear Power Station ("Oyster Creek") is located in the Township of Lacey, Ocean County, New Jersey.  Oyster Creek was a boiling water nuclear reactor that came on line in December of 1969.  Prior to its shutdown in September of 2018, Oyster Creek was the oldest operating commercial nuclear power plant in the United States.  Oyster Creek is now undergoing decommissioning, the process by which the plant is retired from service.

1

2.     Exelon Generating Company, LLC ("Exelon") owned Oyster Creek at the time of its shutdown in September of 2018, and held all licensing issued by the Nuclear Regulatory Commission ("the NRC"), including but not limited to, Renewed Facility Operating License No. DPR-16 and the general license for Independent Spent Fuel Storage Installation ("ISFSI"), all of which are in the name of Exelon or were transferred by the NRC to Exelon as of September of 2018. Attached as **Exhibit A** is a true and correct copy of the Facility Operating License No. DPR-16; attached as **Exhibit B** is a true and correct copy of the Renewed Facility Operating License No. DPR-16; and attached as **Exhibit C** is a true and correct copy of the NRC Order, dated June 20, 2019 approving the transfer of Renewed Facility Operating License No. DPR-16 and the ISFSI general license.

3.     The ISFSI is a facility designed and constructed for long-term interim storage of spent nuclear fuel after its removal from the nuclear reactor.

4.     The ISFSI for Oyster Creek is located on the grounds of the plant, and currently houses spent nuclear fuel from prior operating cycles.  As part of Oyster Creek's NRC - regulated decommissioning process, all spent nuclear fuel must be removed from the nuclear reactor and remaining spent fuel in wet storage added to the ISFSI.  The spent nuclear fuel remains there until a permanent long-term storage option becomes available. Exelon also entered into an Administrative Consent Order with the New Jersey Department of Environmental Protection in January 2018, which reiterated the procedures it must follow with regard to the ISFSI and decommissioning. Attached hereto as **Exhibit D** is a true and complete copy of the January 2018 Administrative Consent Order.

5.     As part of the planned shutdown of Oyster Creek, on or about May 21, 2018, Exelon submitted a Post-Shutdown Decommissioning Activities Report ("PSDAR") to the NRC, which

described the decommissioning activities and proffered a schedule for its completion.  As set forth in the PSDAR, Exelon selected the SAFSTOR decommissioning method, and estimated the decommissioning process would take approximately 60 years, or be complete by approximately 2078. Attached hereto as **Exhibit E** is a true and correct copy of the May 21, 2018 PSDAR.

6.      In August of 2018, Exelon and Oyster Creek Environmental Protection, LLC ("OCEP") and Holtec Decommissioning International, LLC ("HDI"), both wholly-owned subsidiaries of Holtec International ("Holtec"), (and, collectively, "Plaintiffs") requested that the NRC consent to a proposed direct transfer of the Renewed Facility Operating License No. DPR-16 and ISFSI General License from Exelon to OCEP as the licensed owner and to HDI as the licensed operator for decommissioning (the "Exelon Transfer").

7.      The intent was for OCEP to acquire Oyster Creek, including the ISFSI, from Exelon as an asset purchase, and for HDI to serve as the decommissioning operator of Oyster Creek.  Upon approval by the NRC, HDI would be the licensed entity responsible for maintaining and decommissioning the facility.  This included but was not limited to handling, storing, controlling and protecting the spent nuclear fuel, decommissioning and decontaminating the facility, and maintaining the ISFSI, each in accordance with NRC licensing, regulations and oversight.

8.      On September 25, 2018, Exelon certified to the NRC that it had permanently ceased operations at Oyster Creek, and that it had removed all spent nuclear fuel from the nuclear reactor and placed it in the nuclear fuel pool for eventual transition to the ISFSI, which is a timely and complex process.

9.      On or about September 28, 2018, HDI, in anticipation of becoming the new decommissioning operator under the NRC licenses, submitted a revised PSDAR to the NRC in accordance with NRC regulations.   Unlike Exelon, HDI selected Prompt Decommissioning

(DECON) as the decommissioning method, which significantly expedites the decommissioning process, including the transfer of spent nuclear fuel to the ISFSI.    HDI estimated that the decommissioning process would be completed by 2025, as opposed to Exelon's estimate of 2078. Attached hereto as **Exhibit F** is a true and complete copy of the September 29, 2018 revised PSDAR.

10.    On June 20, 2019, the NRC approved the Exelon Transfer.

11.    On July 3, 2019, Exelon, OCEP and HDI completed the Exelon Transfer.

12.    On July 9, 2020, HDI submitted a minor site plan application to the Township of Lacey Planning Board, Application 20-SP-07. Attached hereto as **Exhibit G** is a true and complete copy of Application 20-SP-07.  HDI sought approval to install additional storage modules to store the remaining spent nuclear fuel on a previously constructed concrete pad and a canister transfer pit.  This work was needed as part of the ISFSI.  The application also sought approval to move a security fence around the perimeter of the storage modules, construct a driveway to accommodate the independent spent nuclear fuel storage area and to place 20 additional prefabricated temporary vertical storage modules on the existing storage pad. The Plaintiff sought to have a total of 68 spent fuel storage modules located on this site.

13.    Unlike the existing storage modules at Oyster Creek, which are horizontal, HDI proposed to install vertical storage modules.

14.    The Township of Lacey Planning Board had previously approved 48 storage modules under applications made in  1994 and 2010.  Of those, 34 prefabricated horizontal storage modules are currently in use at Oyster Creek housing spent nuclear fuel.  HDI sought to add 34 new vertical storage modules- 14 under previous approvals, but with vertical orientation, and 20 new vertical storage modules.

15. HDI's minor site plan application met all of the Township of Lacey's land use and development regulations, and did not require any variances or waivers from the Township of Lacey's land development codes.

16. HDI's minor site plan application did not require any approvals or variances from any other State or County entities.

17. On August 10, 2020, HDI also gave a presentation regarding its site plan application and answered extensive questions addressing any potential concerns over radiological safety. HDI also provided responses to extensive questions posed by the Township of Lacey Planning Board Engineer. Attached hereto as **Exhibit H** is a true and complete copy of the August 10, 2020 presentation given by HDI and HDI's responses to questions posed by the Township of Lacey Planning Board Engineer.

18. Nonetheless, on August 24, 2020, the Township of Lacey Planning Board denied HDI's minor site plan application. As reflected in the hearing transcript, and Board Resolution #20-SP-07, the denial was based entirely on concerns over radiological safety. Attached hereto as **Exhibit I** is a true and complete copy of the Township of Lacey Planning Board meeting held on August 24, 2020.

19. The question presented by this case is whether the Defendants' actions in denying HDI's minor site plan application premised solely on radiological safety concerns were proper. The clear answer is no.

20. Defendants' actions are preempted by federal law, specifically the Atomic Energy Act ("AEA"), 42 U.S.C. § 2011 et seq., the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10101 et seq., the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI, and because they seek to and have interfered with Plaintiffs' federal rights.

21.     States and local governments may not interfere with the federal government's exclusive authority over the radiological safety of nuclear power plants, which includes decommissioning.  Any state or local government regulation or action impacting a nuclear power plant, including decommissioning, that is grounded in radiological safety concerns falls squarely within the prohibited and preempted field that comes under the exclusive purview of the federal government, in this case the NRC.

22.     By this action, Plaintiffs seeks a declaratory judgment that Defendants were not authorized to deny HDI's otherwise conforming minor site plan application premised solely on radiological safety concerns.

23.     By this action, Plaintiffs also seek a preliminary and permanent injunction prohibiting Defendants from incorporating any aspect of radiological safety into their decision as to whether HDI's minor site plan application meets the Township of Lacey's land use and development regulations upon reapplication or direct remand.

24.     By this action, Plaintiffs also seek an emergent preliminary and permanent injunction permitting Plaintiffs to conduct dry runs (i.e. practice demonstrations) as required as part of their spent fuel campaign, which is part of the ISFSI, required by the NRC pursuant to 10 C.F.R. 72.212 and currently scheduled, with NRC involvement to take place in September of 2020.

25.     By this action, Plaintiffs also seek an emergent preliminary and permanent injunction permitting Plaintiffs to conduct the spent fuel campaign, consistent with its revised PASDAR submitted on September 28, 2018.

## THE PARTIES

26.     Plaintiff, Holtec, is a corporation formed in the State of Delaware.  Holtec's primary place of business is 1 Holtec Blvd., Camden, New Jersey.

27.     Plaintiff, HDI, is a limited liability company formed in the State of Delaware. HDI's primary place of business is 1 Holtec Blvd., Camden, New Jersey.  HDI is a wholly owned subsidiary of Holtec.

28.     Plaintiff, OCEP, is a limited liability company formed in the State of Delaware. OCEP's primary place of business is 1 Holtec Blvd., Camden, New Jersey.  OCEP is a wholly owned subsidiary of Holtec.

29.     Defendant, Township of Lacey, is a body politic of the State of New Jersey ("Lacey Township") located in Ocean County, New Jersey.

30.     Defendant, Township of Lacey Planning Board, is the governing body appointed by the Township Committee and tasked with preparing and ensuring compliance with Lacey Township's Master Plan in accordance with the New Jersey Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq. ("Planning Board").

## JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331 (federal question), because this action involves interpretation of the Atomic Energy Act ("AEA", 42 U.S.C. § 2011 et seq., the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10101 et seq., the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI, and because the action seeks to prevent local officials from interfering with the federal rights of Plaintiffs.

32.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391 because all Defendants reside in the State of New Jersey and/or are located in the State of New Jersey, Ocean County.  Venue is also properly vested in this Court because Oyster Creek is located in the State of New Jersey, Ocean County, and all conduct by Defendants at issue in this action took place in

the State of New Jersey, Ocean County.  Venue is also properly vested in this Court because Plaintiffs' primary places of business are located in New Jersey.

33.     There is a present and actual controversy between the parties.

34.     The relief requested is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 (declaratory judgment) and 28 U.S.C. § 1651(a) (injunctive relief).

## SUBSTANTIVE ALLEGATIONS

### I.   REGULATORY OVERSIGHT OF PRIVATE NUCLEAR REACTORS IN THE UNITED STATES

35.     The AEA stemmed from Congress' belief that the national interest would be served if the Government encouraged the private sector to develop atomic energy for peaceful purposes under a program of federal regulation and licensing. The Act implemented this policy decision by opening the door to private construction, ownership, and operation of commercial nuclear-power reactors under the strict supervision of the [NRC].  English v. Gen. Elec. Co., 496 U.S. 72, 81 (1990).  The AEA "provid[es] for licensing of private construction, ownership, and operation of commercial nuclear power reactors for energy production under strict supervision by the [NRC]." Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 63 (1978).

36.     The NRC in turn has created a comprehensive and rigorous licensing procedure for nuclear facilities including ISFSI.  See, 10 CFR §50.33, §50.40 and §72.

37.     States, on the other hand, have "traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like".  Pacific Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n, 461 U.S. 190, 212 (1993).

38.     Likewise, states have no traditional authority over the licensing and operation of nuclear power plants. Under the AEA, the NRC has "exclusive authority over plant construction

8

and operation," such that any attempt by a state or local government "to regulate the construction or operation of a nuclear power plant… would clearly be impermissible ... even if enacted out of non-safety concerns." Id. at 212.

39.     States and their political subdivisions (counties and municipalities), have no authority to regulate the radiological safety of nuclear power plants. "[T]he federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." Id. at 212. Thus, state laws or actions are invalid if they have "some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." English, 496 U.S. at 85.

40.     The prohibitions against States regulating radiological safety noted above apply equally to local municipalities.  See, Hillsborough County v. Automated Medical Laboratories, 471 U.S. 707 (1985).

41.     The AEA allows a state to enter into an agreement with the NRC whereby the state agrees to shoulder some of the burden of regulating nuclear facilities. See, 42 U.S.C. § 2021. Nonetheless, Congress has made clear that issues relating to "construction and operation" of nuclear facilities remain within the exclusive control of the NRC.  Id. § 2021(c). Moreover, there is no such ceding applicable here as the Defendants are local not state actors.

42.     In 1982, Congress enacted the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101-10270, which "establishe[d] a schedule for developing a permanent federal repository" of spent nuclear fuel and "[a]s an alternative to a permanent facility, ... also establishe[d] a federally-monitored temporary storage program." Skull Valley Band of Goshute Indians v. Nielson, 376 F.3d 1223, 1242 (10th Cir. 2004), cert. denied sub nom. Nielson v. Private Fuel Storage, LLC, 546 U.S. 1060 (2005). Pursuant to the AEA and the NWPA, "the Atomic Energy Commission and the

NRC have promulgated detailed regulations regarding the operation of nuclear facilities, including the storage of SNF [i.e., spent nuclear fuel]." Id.; see also id. at 1250 ("Under the federal licensing scheme ..., it is not the states but rather the NRC that is vested with the authority to decide under what conditions to license an SNF storage facility.").

43.     In light of this extensive field preemption of state regulation of nuclear facilities in the areas of licensing, construction and operation, storage of spent nuclear fuel and radiological health and safety, most states containing nuclear facilities have not sought to regulate in such areas. In those instances where states have attempted to intrude into areas subject to NRC's exclusive authority, in particular radiological safety, federal and state courts have repeatedly enforced federal preemption to invalidate the state regulations/actions.

## II.     ISFSI

44.     The transfer and storage of spent nuclear fuel to long-term interim storage is a crucial component of decommissioning, and critical in this case to ensure that the decommissioning schedule at Oyster Creek complies with the revised PSDAR submitted by HDI, and that radiological safety requirements are met.

45.     The transfer and storage of spent fuel involves lifting and placing approximately 75 fuel assemblies (each assembly holding approximately 80 metal rods encasing the uranium pellets) into a Multi-Purpose Canister ("MPC") and Holtec's proprietary, patented transfer cask (HI-TRAC) while in the spent fuel pool. The MPC, which encloses the spent fuel, and HI-TRAC cask are then lifted from the pool, drained, dried, decontaminated, sealed and prepared for the next step in the transfer process. Once ready, the HI-TRAC and MPC are loaded onto a special vehicle that transports the MPC to a Cask Transfer Pit ("CTP").  This is all done in accord with NRC regulation.

46. At the CTP, each MPC will be lowered into the patented HI-STORM FW dry cask storage module (generally described above as a vertical storage module). The HI-STORM FW modules are prefabricated and provide the necessary shielding from radiation as well as structural protection. Once the lid is placed over the module, the HI-STORM FW containing the MPC will be lifted from the CTP and transported to its storage location on a concrete pad at the site- the site is the ISFSI.

47. The CTP, the edge of which was filled with flowable fill as a safety measure to protect employees, will be removed and the area restored upon completion of fuel transfer.

48. Dry cask storage systems such as that being employed at Oyster Creek by Plaintiffs must be designed and operated in accordance with NRC standards at 10 C.F.R. Part 72, and extensive NRC technical guidance.  The NRC's standards and technical guidance exceeds 400 pages.  Attached as **Exhibit J** is a true and correct copy of the cover and table of contents to NRC's Standard Review Plan for Spent Fuel Dry Storage Systems at a General Licensing Facility, NUREG-1536. A full copy can be accessed at https://www.nrc.gov/reading-rm/doc-collections/nuregs/staff/sr1536/r1/sr1536r1.pdf.

49. The NRC reviews and approves dry cask storage systems by issuing a Certificate of Compliance ("CoC").  Holtec's HI-STORM FW storage system been approved by NRC pursuant to CoC No. 1032, as amended.  Attached as **Exhibit K** is a true and correct copy of the original CoC No. 1032 for the HI-STORM FW, issued by NRC on June 13, 2011.

50. As set forth in the CoC, the NRC approved the HI-STORM FW system based on its review of the Final Safety Analysis Report prepared by Holtec, an extensive 870-page report detailing the design and operation of the casks. Attached as **Exhibit L** is a true and correct copy

of the cover and table of contents for the Final Safety Analysis Report for the HI-STORM FW.  A full copy can be accessed at https://www.nrc.gov/docs/ML1236/ML12363A284.pdf.

51.     Oyster Creek has a general license for the ISFSI pursuant to NRC requirements, which is subject to the general licensing conditions under 10 C.F.R. 72.212.

52.     NRC has issued several inspection manuals governing the evaluation of ISFSIs and a licensees' compliance with NRC regulations relating to the ISFSI. Such manuals include NRC Inspection Manual: Review of 10 CFR 721.212(b) Evaluations, Inspection Procedure 60856, a true and correct copy of which is attached as **Exhibit M**.

53.     NRC has also issued "NRC Inspection Manual: On-Site Fabrication of Components and Construction of an ISFSI, Inspection Procedure 60853," a true and correct copy of which is attached as **Exhibit N**.

54.     NRC's inspection of and oversight over decommissioning is also set forth in "NRC Inspection Manual: Decommissioning Power Reactor Inspection Program, Inspection Manual Chapter 2561," a true and correct copy of which is attached as **Exhibit O**.

55.     Since nuclear fuel must be replaced over time, spent fuel has previously been transferred, prior to the decommissioning process, from the reactor building at Oyster Creek to storage on the ISFSI. The first spent fuel campaign to load spent fuel containers into dry cask storage occurred in 2002, utilizing the NUHOMS storage system.  Several additional spent fuel transfer campaigns, consistent with NRC regulations, continued through 2018 at Oyster Creek.

56.     The entire spent fuel loading, transfer, and storage process, along with the use and operation of the dry cask storage system, is inspected and reviewed by NRC.

57.     In accordance with NRC requirements, including Section 9 of the CoC issued by NRC for the HI-STORM FW storage cask, NRC must inspect the site and observe a dry (i.e.

practice) run of the spent fuel loading and transfer onto the ISFSI, including the use of the CTP. HDI has arranged for a dry run process, which includes an NRC review and site inspection.  That dry run is scheduled, with the NRC in attendance, to begin in late September of this year.

58.　　However, as will be addressed in more detail at Paragraphs 72, 73, and 80 of the Complaint, Defendants have indicated they will refuse to allow the dry run, because they denied HDI's minor site plan application. Attached hereto as **Exhibit P** is a true and complete copy of a letter dated September 1, 2020 from Jerry J. Dasti to Richard W. Hunt describing the Township's position refusing the scheduled September dry run.

59.　　Defendants' expressed intention to block the dry run and the subsequent spent fuel campaign is illegal under federal preemption because, as per Section III of this Complaint, their denial of HDI's minor site plan application was premised entirely on radiological safety.

60.　　Defendants are also delaying and interfering with Plaintiffs' obligation to decommission Oyster Creek by their failure to act in good faith regarding NDI's minor site plan application.

### III.　　MINOR SITE PLAN APPLICATION

61.　　As part of the decommissioning and spent fuel transfer campaign, HDI had first evaluated the existing ISFSI, and decided that an expansion of the ISFSI pad would be required to accommodate the additional vertical storage casks.  In addition, HDI planned to construct a new security building.  Based on those plans, HDI submitted an application to Lacey Township for Preliminary and Final Major Site Plan approval, on or about December 12, 2019. A true and correct copy of the December 12, 2019 site plan approval request is attached as **Exhibit Q**.

62.　　HDI subsequently determined that it no longer needed the security building, and removed it from the proposed site plan. HDI submitted those revised plans to Lacey Township,

13

explaining that the building was no longer part of the application. Attached as **Exhibit R** is a true and correct copy of the March 11, 2020, cover letter on behalf of HDI to Lacey Township transmitting the revised plans.

63. HDI also reevaluated the arrangement of dry storage casks on the ISFSI and determined that an expansion of the existing ISFSI concrete pad would no longer be necessary in order to accommodate the casks. Instead, HDI determined it was able to use the space on the existing ISFSI concrete pad. Since the ISFSI pad expansion and security building were abandoned, HDI withdrew its Preliminary and Final Major Site Plan application.

64. On March 27, 2020, Lacey Township issued a Stop Work Order ("SWO") to Plaintiffs (directed to Holtec Industries as "Owner"). In that SWO, Lacey Township opined that Plaintiffs were required to obtain permits that they did not possess. Attached hereto as **Exhibit S** is a true and complete copy of the March 27, 2020 SWO.

65. On April 17, 2020, Plaintiffs filed an appeal to the Ocean County Construction Board of Appeals.

66. On May 27, 2020, Lacey Township and the Township Committee filed a lawsuit against in the Superior Court of New Jersey, Docket OCN-C-76-20 ("State Court Case"). Lacey Township and the Township Committee sought to temporarily and permanently enjoin Holtec and HDI from continuing any and all work at Oyster Creek unless or until permits were provided to counsel for Lacey Township and the Township Committee documenting that the work being undertaken is permitted by the appropriate regulatory authority.

67. On June 2, 2020, over the objection of Holtec and HDI, the Honorable Francis R. Hodgson, Jr., P.J. Ch., entered an Order granting temporarily restraints in favor of and as requested by Lacey Township and the Township Committee, and further ordered the parties to show cause

14

on July 2, 2020, why the restraints should not be permanent.  The Order indicated that the only work that could continue on site was "work which has been permitted by the Nuclear Regulatory Commission, which proof shall be demonstrated to Plaintiffs' attorney."  Attached hereto as **Exhibit T** is a true and complete copy of the June 2, 2020, Order to Show Cause.

68.     On June 3, 2020 Plaintiffs' counsel sent a detailed letter, consistent with the Order to Show Cause, detailing the licensing background for the facility, and explaining the comprehensive NRC jurisdiction over the design, construction, and operation of the ISFSI, demonstrating that the work related to the spent fuel campaign was permitted by the NRC and should be allowed to continue.  Attached hereto as **Exhibit U** is a true and complete copy of the June 3, 2020 letter sent by Plaintiff's counsel.

69.     On July 17, 2020, after negotiations between counsel for the parties, the Honorable Francis R. Hodgson, Jr., P.J. Ch. entered a Consent Order resolving the State Court Case and dismissing it without prejudice.  Amongst other terms, Holtec and HDI agreed to submit a site plan application as described therein.   Attached as **Exhibit V** is a true and correct copy of the July 17, 2020, Consent Order.

70.     Pursuant to the terms of the Consent Order the Township agreed "to work with Defendant [Holtec] to ensure that any approvals will not be unreasonably withheld or delayed." (**Exhibit V**, Paragraph 7).

71.     Further, the Consent Order provided, at Paragraph 6, that "The <u>Township agrees that the performance of the NRC regulated dry runs may begin as scheduled</u> in September 2020 even if permits and the Certificate of Approval are not issued at that time, however the spent fuel campaign shall not begin until permits are issued.  <u>The Township agrees to work with Defendants to not impact this schedule, and to ensure that any approvals will not be unreasonably withheld or</u>

delayed. To that end, the Township may inspect the CTP as soon as this Consent Order is executed." (**Exhibit V**, Paragraph 6, emphasis supplied).

72. Paragraph 6 went on to specifically set forth the specific components of the dry run procedure, as provided for pursuant to 10 C.F.R. 72.212.

73. Accordingly, on June 9, 2020 HDI submitted a minor site plan application to the Township of Lacey Planning Board, Application 20-SP-07. (See **Exhibit G**).

74. Prior to the final public hearing held on August 24, 2020, Defendants submitted a series of questions to and sought information and documents from Plaintiffs. Virtually every question posed and all information and documents sought by Defendants addressed radiological safety concerns.

75. At the final public hearing held on August 24, 2020, Plaintiffs presented written answers to Defendants' questions, and answered all other questions presented and information and documents sought with the highest level of detail possible.

76. HDI's minor site plan application met all of Lacey Township's land use and development regulations.

77. HDI's minor site plan application did not require any approvals, variances, or waivers from any other state or county entities.

78. Nonetheless, on August 24, 2020, Defendants denied HDI's minor site plan application due entirely to concerns over radiological safety.

79. Further, the Township Solicitor, contrary to the language and intention of the Consent Order and prior verbal representations to Holtec's counsel, has now taken the position that the Planning Board approval was a prerequisite for the NRC regulated dry run process. (See **Exhibit P**), which is currently scheduled, through the NRC, to begin in September, 2020.

16

80.     Accordingly, Defendants, contrary to the New Jersey Municipal Land Use Law ("MLUL") and the AEA, and in contravention of the NRC regulated ISFSI spent fuel campaign, for which the preliminary dry run process is currently scheduled to begin, with NRC oversight, at the end of September, have indicated their intent to frustrate this urgent nuclear safety procedure.

## CAUSES OF ACTION

### COUNT ONE
### AEA/NRC PREEMPTION
### (Declaratory and Injunctive Relief)

81.     Plaintiff incorporates paragraphs 1-81 above as if alleged herein at length.

82.     The AEA vests in the NRC exclusive jurisdiction over the licensing and operation of nuclear power facilities, including decommissioning and, specifically, ISFSI.  Local government laws, regulations and actions that have or seek to have a direct and substantial impact on nuclear plant operations, including decommissioning and, specifically ISFSI, are preempted under the Supremacy Clause, U.S. Const. Art. VI.

83.     Likewise, the NRC has exclusive authority over radiological safety.  Local government laws, regulations and actions that have or seek to have any impact on radiological safety are preempted under the Supremacy Clause, U.S. Const. Art. VI.

84.     Defendants' decision to deny HDI's minor site plan application (Application 20-SP-07) premised solely on radiological safety concerns was improper and preempted as radiological safety concerns are within the exclusive province of the NRC.

85.     Defendants' improper decision to deny HDI's minor site plan application (Application 20-SP-07) premised solely on radiological safety concerns and its intention to shut down Plaintiffs' efforts to conduct a dry run, will impermissibly shut down HDI's ability to proceed

17

with its spent fuel campaign, and otherwise materially interfere with Plaintiffs' decommissioning efforts at Oyster Creek, in particular the ISFSI.

86.    It is essential that HDI be able to proceed with the dry run, scheduled to begin in late September, and with the spent fuel campaign which are of the utmost importance and urgency to ensure the safe and timely storage of spent nuclear fuel from the decommissioned reactor.

87.    Plaintiffs seek a declaration that Defendants are preempted from stopping or interfering with the federally licensed decommissioning of Oyster Creek, specifically, the ISFSI, by applying radiological safety concerns when deciding municipal land use applications.

88.    Plaintiffs seek a preliminary and permanent injunction against any action by Defendants to stop or interfere with Plaintiffs' commencement of the dry run at Oyster Creek in light of their improper denial of HDI's minor site plan application (Application 20-SP-07).

## **PRAYER FOR RELIEF**

In light of the foregoing, Plaintiffs respectfully request that the Court:

I.    Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201 and § 2202, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure, that: (1) federal law preempts the Defendants from applying radiological safety concerns as a factor when deciding any application by Plaintiffs submitted pursuant to Lacey Township's land use and development regulations as radiological safety comes under the exclusive purview of the NRC; (2) Defendants shall not reject any future application by Plaintiffs submitted pursuant to Lacey Township's land use and development regulations based on radiological safety concerns as radiological safety comes under the exclusive purview of the NRC; and (3) Defendants improperly denied HDI's minor site plan application, #20-SP-07, because they did so solely because of concern over radiological

18

safety and not based on Lacey Township's land use ordinances that govern minor site plan approval;

II.    Issue temporary, preliminary and permanent injunctive relief pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, that; (1) temporarily, preliminarily, and permanently enjoining Defendants from any and all actions of any kind which would frustrate or obstruct Plaintiffs' ability to move forward with the NRC-regulated dry run process that is currently scheduled to begin in late September 2020; (2) the spent fuel storage campaign, or Plaintiffs' ability to operate and facilitate said campaign; (3) all activities related to transfer and storage of spent fuel as related to the Independent Spent Fuel Storage Installation ("ISFSI"); (4) requiring and mandating that Defendants not withhold any permits and/or approvals that are part of the dry run or spent fuel storage campaign administrative process; (5) generally enjoining Defendants from any actions which attempt to control, regulate, or impact radiological safety considerations, which is an area preempted by Federal regulations; (6) enjoining Defendants from applying radiological safety concerns as a factor when deciding any application by Plaintiffs submitted pursuant to Lacey Township's land use and development regulations as radiological safety comes under the exclusive purview of the NRC; (7) enjoining Defendants from rejecting any future application by Plaintiffs submitted pursuant to Lacey Township's land use and development regulations based on radiological safety concerns as radiological safety comes under the exclusive purview of the NRC; and (9) enjoining Defendants from prohibiting the dry run at Oyster Creek;

III.    Award reasonable attorneys' fees and costs to Plaintiffs; and

19

IV.     Award such other relief as the Court deems just and equable.

## COUNT TWO
## CONSTITUTIONAL DEPRIVATION

89.     The Plaintiffs incorporate all of the foregoing paragraphs by reference as if those paragraphs were fully set forth at length herein.

90.     Jurisdiction to entertain Plaintiffs' State Constitutional legal claims is conferred upon the Federal District Court pursuant to 42 U.S.C. 1983.

91.     It is undisputed that the Plaintiff owns a 139.65 acre tract of land within the Lacey Township-Ocean Township Border which is more precisely defined as Block 1001, Lot 4.02, as set forth on the Tax Maps of Lacey Township and which contains the Oyster Creek Nuclear Facility currently being decommissioned.

92.     As set forth in the Resolution of Denial 20-SP-07 (attached hereto as **Exhibit Y**)

> 1.      The applicant is requesting approval of a minor site plan application in accordance with the Lacey Township Land Use and Development Regulations.  The site is currently a nuclear power generating station, consisting of 139.65 acres on the Lacey Township/Ocean Township border.  The existing temporary spent nuclear fuel storage area is located east of the existing power plant.  The storage area contains 48 prefabricated horizontal storage modules within a security fence.  Twenty of the existing storage modules were approved in 1994 by Lacey Township Zoning Board of Adjustment Resolution 93-40, and 28 additional storage modules were approved in 2010 by Lacey Township Planning Board Resolution 10-SP-05.  The applicant now seeks minor site plan approval to expand the independent spent nuclear fuel storage area to construct 28 additional temporary vertical storage modules on a previously constructed concrete/canister transfer pad, plus 6 additional temporary vertical storage modules on another existing concrete pad, for a total of 34 additional temporary storage modules.

93.     It is undisputed that the Plaintiffs have a proprietary interest, which is protected by the Federal and State Constitutions, in the subject property.

94.     It is undisputed that the Plaintiff HDI requested approval in accordance with the MLUL.

95.     It is undisputed that subject property is located in the M-100 Industrial Zone, in the Forked River section of the Township.

96.     It is undisputed that the Lacey Township Zoning Ordinance allows for the zoning regulation of the Plaintiffs' property.

97.     It is undisputed that ongoing maintenance and proposed decommissioning of the facility necessarily includes the storage of spent fuel.

98.     The Board's denial of the Plaintiffs' Application was ultra vires.

99.     The Board's denial of the Minor Site Plan was clearly premeditated, as reflected by the questions posed by the Board to the Plaintiffs prior to the hearing, the Board's questioning during the hearing, and the certified Board Resolution.  (**Exhibit Y**)

100.    The Board's denial of the Plaintiffs' Application was motivated by political bias and coercion, and was done with reckless disregard for Plaintiffs' rights and property interests.

101.    The Board's denial of the Plaintiffs' Application was not only unreasonable, arbitrary, and capricious but the means selected by the Defendant to deny the Plaintiffs' Application had no real and substantial relation to the MLUL.  Schmidt v. Board of Adjustment of City of Newark, 9 N.J. 405 (1952).

102.    Throughout the Plaintiffs' Application process, the Plaintiffs were entitled to Due Process, both procedural and substantive, which is designed to prevent fundamental unfairness.

103.     The purpose of the constitutional limitations in the 14th Amendment of the Bill of Rights and in the Due Process and Equality clauses of the Federal and State Constitutions is to safeguard the fundamental rights of persons and property against arbitrary and oppressive state action.

104.     The actions of that Planning Board were ultra vires and premediated and constitute a violation of Plaintiffs' constitutional rights.

105.     An example of the ultra vires, premediated, unreasonable, coerced and biased conduct of the Board occurred during the August 10, 2020, and August 24, 2020 Hearing, during which various Board Members asked questions of and made comments to the Plaintiffs' Experts that involved issues that were clearly within the purview of the NRC.

106.     As reflected in the questions posed prior to the hearing, the questions posed at the hearing and the Resolution of Denial, the Board Members overtly and egregiously exceeded their authority to review the Minor Site Plan with regard to the duties empowered to the Board pursuant to N.J.S.A. 40:55D-1 et seq. and the Township Code regarding Site Plan Review.

107.     Acts by a Planning Board that are ultra vires, premediated and or motivated by political bias not only constitute a violation of a property owner's constitutional rights including a violation of 42 U.S.C. 1983.  The above referenced comments, demands, questions and subsequent denial of the Application without any deliberation on the merits of the testimony or discussion with the Board's professionals is *prima facie* evidence of the Board's tainted bias and premediated process which violates the Plaintiffs' constitutional rights.  Their actions deprived the Plaintiff of Due Process, and created a manifest injustice, which must be addressed.

108.     Plaintiff HDI was entitled to Due Process, both procedural and substantive, which is designed to prevent fundamental unfairness.  However, these constitutional entitlements were

indiscriminately violated when the Board Members presented various demands and requirements of the Plaintiffs, which clearly exposed the Board's pre-disposition and bias against the Plaintiffs.

109.   The purpose of the constitutional limitations in the 14th Amendment and in the Due Process and Equality Clauses of the Federal and State Constitution is to safeguard the fundamental rights of persons and property against arbitrary and oppressive state action.  Therefore, acts by a Board that are ultra vires, premediated and or motivated by political bias are prohibited and constitute a violation of a property owner's constitutional rights.

WHEREFORE, Plaintiffs demand the entry of judgment in its favor and against the Board for compensatory damages, attorney's fees, and cost of suit as well as damages authorized under 42 U.S.C. 1983, including a civil penalty, and any other equitable relief deemed just.

**PARKER McCAY, P.A.**
Attorneys for Plaintiffs
Holtec International, Holtec
Decommissioning International, LLC
and Oyster Creek Environmental Protect, LLC

*s/Richard W. Hunt*

Dated:  September 16, 2020          By: _____
                                           RICHARD W. HUNT

## DEMAND TO PRESERVE EVIDENCE

Defendants are directed and demanded to preserve all physical and electronic information of, about, relating or pertaining to plaintiffs, defendants, to plaintiffs' cause of action and/or prayers for relief, to any defenses to same, or to any party, including, but not limited to, electronic data storage, closed circuit TV footages, digital images, computer images, cache memory, searchable data, emails, spread sheets, employment files, memos, text messages and any and all online social or work related websites, entries on social networking sites (including, but not limited to,

Facebook, Twitter, etc.), and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this litigation.  Failure to do so will result in separate claims for sanctions, spoliation of evidence and/or appropriate adverse inferences.

**PARKER McCAY, P.A.**
Attorneys for Plaintiffs
Holtec International, Holtec
Decommissioning International, LLC
and Oyster Creek Environmental Protect, LLC

*s/Richard W. Hunt*

Dated:  September 16, 2020          By:  _____

RICHARD W. HUNT


Pursuant to Rule 28 U.S.C. 1746, this matter is currently not the subject of any other action pending in any court.  In the event that becomes no longer the case, I will promptly notify the Court.

**PARKER McCAY, P.A.**
Attorneys for Plaintiffs
Holtec International, Holtec
Decommissioning International, LLC
and Oyster Creek Environmental Protect, LLC

*s/Richard W. Hunt*

Dated:  September 16, 2020          By:  _____

RICHARD W. HUNT

24

## <u>VERIFICATION</u>

I, JEFFREY P. DOSTAL, of full age, say:

1.      I am the Vice President for Plaintiff, Holtec Decommissioning International, LLC ("Holtec"), and am authorized to make this Verification on behalf of the Holtec Plaintiffs in the above-captioned action in support of the allegations contained and relief sought by this Verified Complaint and the accompanying Order to Show Cause.

2.      I have read the foregoing Verified Complaint, and hereby verify that all allegations contained therein are true and correct to the best of my knowledge, belief, and information available to me, except those made on information and belief.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: September 16, 2020        By:_____ _____
                                         JEFFREY P. DOSTAL

4813-8861-9979, v. 6

25