**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HOLTEC INTERNATIONAL, et al.<br><br>Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF LACEY, et al.<br><br>Defendants. | Civil Action No. 20-12773 (MAS) (DEA)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Plaintiffs Holtec International ("Holtec"), Holtec Decommissioning International, LLC ("HDI"), and Oyster Creek Environmental Protection, LLC's ("OCEP") (collectively, "Plaintiffs") Motion for a Temporary Restraining Order. (ECF No. 3.) Defendants Township of Lacey (the "Township") and Lacey Township Planning Board (the "Planning Board") (collectively, "Defendants") opposed (ECF Nos. 13, 15) and Plaintiffs replied (ECF No. 18). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Plaintiffs' Motion is denied.

## I. BACKGROUND

Plaintiffs own Oyster Creek Nuclear Power Station ("Oyster Creek"), a shutdown nuclear power plant in Ocean County, New Jersey.[1] (Compl. ¶ 1, ECF No. 1.) Oyster Creek is currently

---

[1] OCEP and HDI are both wholly owned subsidiaries of Holtec. (Compl. ¶ 6.) OCEP is the licensed owner of Oyster Creek and HDI serves as the plant's decommissioning operator. (*Id.* ¶ 7.)

undergoing decommissioning, a "process by which [a] plant is retired from service." (*Id.*) The decommissioning process is regulated by the Nuclear Regulatory Commission ("NRC")[2] and includes the transfer of all spent nuclear fuel from a spent fuel pool to an on-site storage facility known as the Independent Spent Fuel Storage Installation ("ISFSI"). (*Id.* ¶¶ 3–4.) In order to perform the spent fuel campaign, Plaintiffs must first complete a mandatory dry run (i.e., practice demonstrations). (*Id.* ¶ 24.)

On July 9, 2020, Plaintiffs submitted a minor site application (the "Application") to the Planning Board, essentially seeking to expand the ISFSI area. (*Id.* ¶ 12.) The Planning Board, however, denied the Application on August 24, 2020. (*Id.* ¶ 18.) Plaintiffs assert that this denial resulted in the suspension of a three-day dry run scheduled to begin on October 26, 2020.[3] (Dostal Aff. ¶ 11, ECF No. 3-2.)

### A.  Oyster Creek Background

In January 2018, Exelon Generating Company, LLC ("Exelon"), the previous owner of Oyster Creek, and the New Jersey Department of Environmental Protection entered into an Administrative Consent Order ("ACO") governing the decommissioning of Oyster Creek. (Compl. ¶¶ 2–3; ACO Doc., Ex. D to Compl., ECF No. 1-1.) Among other things, the ACO directed Exelon to submit a Post-Shutdown Decommissioning Activities Report ("PSDAR") to the NRC. (ACO Doc. 1–2.) The ACO also provided that "Exelon will transfer all fuel to the ISFSI as soon as technically and financially feasible and in accordance with the Facility's PSDAR." (*Id.* at 3.)

---

[2] The NRC is an independent regulatory agency exercising all of the licensing and related regulatory functions formerly assigned to the Atomic Energy Commission. 42 U.S.C. §§ 5841(f), 5842.

[3] Plaintiffs indicate that a dry run related activity at their Camden Facility was scheduled for September 28 through September 30, 2020. (Dostal Aff. ¶ 11.)

2

On May 21, 2018, Exelon submitted the PSDAR, which included a "description of the planned decommissioning activities [and] a schedule for their accomplishment." (Exelon's PSDAR 3, Ex. E to Compl., ECF No. 1-1; Compl. ¶ 5.) The PSDAR indicates that Exelon selected the SAFSTOR decommissioning method.[4] (*Id.* at 4–5.) Under SAFSTOR, Exelon intended to commence the transfer of spent fuel to the ISFSI in March 2020 and expected to complete the transfer in March 2024. (*See id.* at 8, 12.) According to the PSDAR, Exelon estimated the overall decommissioning process would be completed by approximately 2078. (*Id.* at 8.) Exelon also indicated in the PSDAR that no abnormal environmental issues were expected to result from use of the SAFSTOR method. (*See id.* at 22–41.)

Sometime thereafter, Plaintiffs and Exelon entered into an agreement for the sale of Oyster Creek that was subject to the NRC's approval. (*See* Compl. ¶ 6.) In anticipation of the acquisition, Plaintiffs submitted a revised PSDAR to the NRC on September 28, 2018. (*Id.* ¶ 9; Pls.' PSDAR 4, Ex. F to Compl., ECF No. 1-1.) Unlike Exelon, Plaintiffs selected the DECON decommissioning method.[5] (Pls.' PSDAR 4.) Plaintiffs' PSDAR appears to indicate that they intended to commence the spent fuel campaign around June 2019 and expected to complete the transfer around June 2023. (*See id.* at 17.) According to the PSDAR, Plaintiffs sought to complete the decommissioning process, except for activities related to the ISFSI, "within approximately eight years of license

---

[4] SAFSTOR is "[a] method of decommissioning in which a nuclear facility is placed and maintained in a condition that allows the facility to be safely stored and subsequently decontaminated (deferred decontamination) to levels that permit release for unrestricted use." (Exelon's PSDAR 10.)

[5] Plaintiffs PSDAR describes the DECON decommissioning method as follows: "The equipment, structures, and portions of the facility and site that contain radioactive contaminants are promptly removed or decontaminated to a level that permits termination of the license shortly after cessation of operations." (Pls.' PSDAR 4.)

3

transfer." (*Id.* at 10.) On June 20, 2019, the NRC approved the transfer and Plaintiffs acquired Oyster Creek shortly thereafter. (Compl. ¶¶ 11–12.)

### B. Plaintiffs' Application to the Planning Board

In December 2019, Plaintiffs submitted an initial application to the Planning Board seeking approval to, among other things, expand the ISFSI pad to accommodate additional storage casks. (Compl. ¶ 61; Dec. 2019 Appl., Ex. Q to Compl., ECF No. 1-3.) Plaintiffs assert that they ultimately withdrew this application after determining that the proposed project was no longer necessary. (Compl. ¶¶ 62–63.) Plaintiffs, however, allegedly performed unauthorized construction at the site. Consequently, in March 2020, the Township issued a stop construction order to Plaintiffs for failing to obtain construction permits. (Stop Construction Order Doc. ("SCO"), Ex. S to Compl., ECF No. 1-3; Compl. ¶ 64.) The order also advised Plaintiffs that they may resume construction after obtaining the proper permits. (*See generally* SCO.) By correspondence dated May 14, 2020, the Township again advised Plaintiffs to obtain the proper permits before continuing construction at Oyster Creek. (May 14, 2020 Correspondence, Ex. D to Def. Twp.'s Opp'n Br., ECF No. 15-1.)

After Plaintiffs allegedly continued unauthorized construction, the Township filed a lawsuit in the Superior Court of New Jersey, Ocean County, Chancery Division,[6] seeking to enjoin Plaintiffs from continuing to undertake such work until they obtained the necessary approvals and permits. (May 27, 2020 Superior Ct. Compl., Ex. E to Def. Twp.'s Opp'n Br., ECF No. 15-1; Compl. ¶ 66.) The Superior Court entered an order granting the Township's requested relief. (Compl. ¶ 67.) On July 17, 2020, following settlement discussions by the parties, the Superior

---

[6] *Twp. of Lacey v. Holtec Int'l*, Docket No. OCN-C-76-20.

4

Court entered a consent order resolving the matter. (*Id.* ¶ 69; Consent Order, Ex. V to Compl., ECF No. 1-3.) The consent order indicated that Plaintiffs would submit a site plan application for any prior and planned construction at Oyster Creek. (Consent Order ¶ 1.)

That same month, Plaintiffs submitted the Application to the Planning Board in which they described the project as "includ[ing] the filling of a hole where a concrete pad was originally supposed to be constructed for spent fuel storage installation expansion." (July 2020 Appl., Ex. G to Compl., ECF No. 1-1.) The Planning Board held two hearings on the Application in August 2020 and, following the second hearing, denied the Application. (Compl. ¶¶ 74–75, 105.)

On September 14, 2020, the Planning Board adopted Resolution 20-SP-07 (the "Resolution") denying Plaintiff's Application. (*See generally* Resolution Doc., Ex. Y to Compl., ECF No. 1-3.) In support of denying the Application, the Resolution provides in part that Plaintiffs "mischaracterized the nature of the [A]pplication as a proposed temporary spent nuclear fuel storage site" because Plaintiffs "provided absolutely no representation as to how many decades or even centuries the 'temporary' storage will last." (Resolution Doc. 163.) The Resolution also provides that Plaintiffs "made numerous inconsistent, self-serving, misleading and non-credible statements during [their] presentation." (*Id.* at 164.) Consequently, the Township informed Plaintiffs that they could not proceed with the dry run due to the Planning Board's denial of the Application.[7] (Compl. ¶ 79; Sept. 1, 2020 Correspondence, Ex. P to Compl., ECF No. 1-3.)

---

[7] Plaintiffs and the Township direct the Court to a provision in the July 2020 consent order in support of their respective positions regarding whether the dry run was contingent on Plaintiffs obtaining the proper approvals and permits. The provision provides, in relevant part:

> 6. In the event the [Application] is approved by the Planning Board, [Plaintiffs] shall apply for construction permits to use the Cask Transfer Pit ("CTP") for its spent fuel transfer campaign. No new construction may take place until a construction permit is issued, and [Plaintiffs] have applied for permits and received the proper

5

### C. Procedural History

On September 16, 2020, Plaintiffs filed a lawsuit against the Planning Board in the Superior Court of New Jersey, challenging the Planning Board's decision.[8] (Sept. 2020 Superior Ct. Compl., Ex. 1 to Def. Planning Bd.'s Opp'n Br., ECF No. 13-1.) That same day, Plaintiffs filed the instant two-count Complaint alleging: (1) federal preemption—specifically, that the Planning Board improperly based its decision "solely on radiological safety concerns" because such concerns "are within the exclusive province of the NRC" pursuant to the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*—(Compl. ¶¶ 81–88); and (2) constitutional deprivation (*id.* ¶¶ 89–108).

On September 17, 2020, Plaintiffs filed the instant Motion, seeking to enjoin Defendants from preventing the scheduled dry run and spent fuel campaign. (ECF No. 3.)

## II. LEGAL STANDARD

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). This remedy should be granted only if Plaintiffs establish that: (1) "they are likely to succeed on the merits of their claims"; (2) "they are likely to suffer irreparable harm without relief"; (3) "the balance of harm favors them"; and (4) "relief is in

---

inspection. . . . It is understood that the CTP will NOT be used to execute the spent fuel program, until [Plaintiffs] receive site plan approval and construction permits. The Township agrees that the performance of the NRC regulated dry runs may begin as scheduled in September 2020 even if permits and the Certificate of Approval are not issued at that time, however the spent fuel campaign shall not begin until permits are issued. The Township agrees to work with [Plaintiffs] to not impact this schedule, and to ensure that any approvals will not be unreasonably withheld or delayed.

(Consent Order ¶ 6; Compl. ¶¶ 71, 79; Def. Twp.'s Opp'n Br. 4–5.)

[8] *Holtec Decommissioning Int'l v. Twp. of Lacey Planning Bd.*, Docket No. OCN-L-2165-20.

6

the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citation omitted). Plaintiffs "must meet the threshold for the first two 'most critical' factors"—likely to succeed on the merits and likely to suffer irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

### III. DISCUSSION

#### A. Irreparable Harm

##### 1. Parties' Positions

In support of their Motion, Plaintiffs submit the Affidavit of Jeffrey P. Dostal ("Dostal"), HDI's Site Vice President. (Dostal Aff., ECF No. 3-2.) There, Dostal recounts much of the facts and allegations set forth above. (*See id.* ¶¶ 3–15.) Dostal asserts that the dry run "is essential to the decommissioning process and essential to the safety of the community." (*Id.* ¶ 16.) Dostal notes that the "dry run procedure and subsequent spent fuel campaign include a tremendous commitment of time, equipment, and personnel." (*Id.* ¶ 17.) Finally, Dostal contends that Defendants' actions carry a "potential" to adversely "impact and delay" the spent fuel campaign, which "severely jeopardizes [Plaintiffs'] agreement and obligations concerning the Oyster Creek decommissioning." (*Id.* ¶ 18.)

In their Moving Brief, Plaintiffs present two arguments in support of irreparable harm: (1) "they cannot advance decommissioning Oyster Creek and/or the spent nuclear fuel transfer campaign" in accordance with their revised PSDAR (Pls.' Moving Br. 33); and (2) they are "[un]able to comply with the ACO" provision providing for the transfer of all nuclear fuel to the ISFSI "as soon as technically and financially feasible and in accordance with the Facility's

PSDAR" (*id.* at 34). Such noncompliance, Plaintiffs argue, "may . . . expose[] [them] to assessments under the ACO that are tied to timely performance." (*Id.*) In opposition, Defendants contend that Plaintiffs' alleged injury is financial in nature and, therefore, ultimately compensable. (Def. Planning Bd.'s Opp'n Br. 16, ECF No. 13; Def. Twp.'s Opp'n Br. 16–18, ECF No. 15.) Moreover, Defendants assert that Plaintiffs created the alleged injury by, among other things, prematurely scheduling the dry run without first obtaining the proper permits and approvals. (Def. Planning Bd.'s Opp'n Br. 3–4, 16; Def. Twp.'s Opp'n Br. 17.)

In reply, Plaintiffs seem to argue that delaying the dry run could result in irreparable harm to the public's safety. (*See* Pls.' Reply Br. 8–9, ECF No. 18; Dostal Suppl. Aff. ¶ 4, ECF No. 18-2.) In support, Plaintiffs rely on a Supplemental Affidavit from Dostal, who asserts that the spent fuel pool at Oyster Creek has a "structural safety concern in that a crack could propagate due to the external temperature," which "could cause leaking" and "result[] in contamination spreading." (Dostal Suppl. Aff. ¶ 7.) Dostal also asserts that "[a]n impact accident or terrorist attack that damages a spent fuel pool could result in a partial or complete loss of water coolant," which can result in "the release of radioactive constituents to the environment." (*Id.* ¶ 8.) As an example, Dostal points to the Fukushima Plant nuclear accident of 2011 where the plant's spent fuel pool lost water coolant "[a]s a result of an earthquake and tsunami." (*Id.* ¶ 11; Pls.' Moving Br. 9.)

### 2. Plaintiffs Fail to Establish They are Likely to Suffer Irreparable Harm Absent Relief

To demonstrate irreparable harm, "a plaintiff has the burden of proving a clear showing of immediate irreparable injury." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (internal quotation marks and citation omitted). Merely "[e]stablishing a risk of irreparable harm is not enough [to warrant a preliminary injunction]." *Id.*; *see also Laidlaw, Inc. v. Student Transp. of Am.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998) ("[T]he claimed injury cannot merely be possible,

8

speculative[,] or remote."). "[T]he injury created by a failure to issue the requested injunction must be of a peculiar nature, so that compensation in money cannot atone for it." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted).

Here, the Court finds that Plaintiffs fall short of establishing a clear showing of immediate irreparable harm. As Defendants note, Plaintiffs' alleged injury appears to be self-created and strictly financial in nature. That is, Plaintiffs seem to have prematurely scheduled the dry run without first obtaining the proper permits and now, as Plaintiffs acknowledge, they *potentially* face assessments under the ACO. (Pls.' Moving Br. 34.) Moreover, the ACO itself sets no definite schedule but rather merely provides that the spent fuel campaign should be completed "as soon as technically and financially feasible." (ACO Doc. 4.) Plaintiffs' allegations, therefore, present no more than a mere speculation of financial harm. Even if Plaintiffs had alleged a sufficiently concrete financial injury, however, their argument would still fail because a "purely economic" injury is ultimately compensable and therefore generally does not constitute irreparable harm. *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987).

Plaintiffs also make an unavailing conclusory assertion that, because the "emergent concerns related to radiological safety are certainly of a peculiar nature," the harm is not compensable. (Pls. Reply Br. 9.) While it is true that an environmental injury can constitute irreparable harm, *Amoco Production Company v. Village of Gambell*, 480 U.S. 531, 545 (1987), there are no facts set forth from which the Court could conclude that such injury is sufficiently "likely" or "imminent." Plaintiffs' only evidence comes from Dostal's Supplemental Affidavit in which he "expand[s]" on his previous submission and posits that the spent fuel pool has structural safety concerns that may cause a leak and that radioactive constituents may be released if an incident causes sufficient loss of water coolant. (Dostal Suppl. Aff. ¶¶ 3, 7–9.) This self-serving

9

statement, based primarily on the Fukushima incident that resulted from natural phenomena unheard of in this state, and submitted for the first time in reply does not establish a sufficient likelihood of environmental harm. Notably, Plaintiffs elected to change the decommissioning method from SAFSTOR—in which Exelon reported that no abnormal environmental issues were expected to result from the approximately sixty-year decommissioning process—to DECON. (Compl. ¶ 9.) Plaintiffs, therefore, cannot persuasively claim that postposing the dry run would likely result in irreparable harm. The Court, accordingly, finds that Plaintiffs fail to establish a likelihood of imminent irreparable harm.[9]

### B. *Younger* Abstention

The Planning Board also argues that, due to the ongoing state court proceeding, this Court should abstain from adjudicating this matter under *Younger v. Harris*, 401 U.S. 37 (1971). (*See* Def. Planning Bd.'s Opp'n Br. 15 (citing *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 408 (3d Cir. 2005) (discussing *Younger* abstention)).) In response, Plaintiffs assert that they are not seeking to overturn the Planning Board's decision as in the pending state court action. (Pls.' Reply Br. 16.) Rather, Plaintiffs assert they "are requesting that this Court, on the basis of federal preemption, find that" Defendants are "frustrating the operation of a federally regulated facility and the spent fuel transfer process with no jurisdiction to do so." (*Id.*)

Federal district courts have a "virtually unflagging obligation" to adjudicate claims within its jurisdiction. *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988). "Although the general rule is that the pendency of a state court proceeding is not a reason for a federal court to decline to exercise

---

[9] Because the Court concludes that Plaintiffs fail to demonstrate irreparable harm, it does not address the likelihood of Plaintiffs' success on the merits of their claim. *See Morton*, 822 F.2d at 367 ("To obtain a preliminary injunction, the moving party must demonstrate *both* a likelihood of success on the merits and the probability of irreparable harm if relief is not granted.").

10

jurisdiction established by Congress, an exception to that rule is *Younger* abstention." *Yang v. Tsui*, 416 F.3d 199, 201 (3d Cir. 2005) (citation omitted). Under the *Younger* abstention doctrine, "[a] federal district court has discretion to abstain from exercising jurisdiction over a particular claim where resolution of that claim in federal court would offend principles of comity by interfering with an ongoing state proceeding." *Kendall v. Russell*, 572 F.3d 126, 131 (3d Cir. 2009) (citing *Addiction Specialists*, 441 F.3d at 408).

In *Sprint Communications, Inc. v. Jacobs*, the Supreme Court held that *Younger* abstention is limited to "three exceptional categories[:]" (1) "state criminal prosecutions"; (2) "civil enforcement proceedings"; and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." 571 U.S. 69, 73, 79 (2013) (citation omitted). In doing so, the Supreme Court rejected the Eighth Circuit's interpretation of *Younger* that was based on its previous decision in *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423 (1982). *Sprint Commc'ns*, 571 U.S. at 81. Specifically, the Supreme Court rejected the notion that *Younger* abstention is warranted "whenever [the following] three conditions are met: [t]here is (1) an ongoing state judicial proceeding; which (2) implicates important state interests, and (3) . . . provide[s] an adequate opportunity to raise [federal] challenges." *Id.* (third and fourth alterations in original) (internal quotation marks and citation omitted). The Supreme Court stated that these conditions were "not dispositive" but "were, instead, *additional* factors appropriately considered by the federal court before invoking *Younger*." *Id.* (emphasis in original). The Supreme Court warned that "[d]ivorced from their quasi-criminal context, the three *Middlesex* conditions would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest." *Id.* This result, the Supreme Court noted, "is irreconcilable with [the]

dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the exception, not the rule." *Id.* at 81–82 (internal quotation marks and citation omitted).

Here, the pending state court proceeding does not fall under any of the three categories delineated by the Supreme Court in *Sprint*. That is, the state court action is neither a criminal proceeding nor a civil enforcement proceeding. *See id.* at 79–80 (noting that civil enforcement actions are "akin to a criminal prosecution" where "a state actor is routinely a party to the state proceeding and often initiates the action"; the proceedings "are characteristically initiated to sanction" a party "for some wrongful act"; and "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges."). Moreover, the state court action does not fall under the third category relating to the "state courts' ability to perform their judicial functions," which has been applied to proceedings for "civil contempt order[s]" and "posting bond[s] pending appeal." *Id.* at 79. The Court, therefore, finds that *Younger* abstention is inappropriate.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for a Temporary Restraining Order is denied. In addition, the Planning Board's abstention request is denied. The Court will enter an Order consistent with this Memorandum Opinion.

/s/ Michael A. Shipp

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**